FILED
U.S. DISTRICT COURT
BRUNSWICK DIV.

2019 MAY 20 PM 4: 48

CLERK_____
SO. DIST. OF GA.

The STATE OF GEORGIA, by and
through THE GEORGIA VOCATIONAL
REHABILITATION AGENCY, and BASE
SERVICES OF ATHENS, INC.,

     Plaintiffs,

     v.

THE UNITED STATES OF AMERICA,
by and through the HONORABLE
PATRICK SHANAHAN, Secretary of
Defense; and the HONORABLE
RICHARD V. SPENCER, Secretary
of the Navy,

     Defendants.

2:19-CV-00045

## ORDER

Before the Court is Plaintiffs the State of Georgia, by and through the Georgia Vocational Rehabilitation Agency's, and Base Services of Athens, Inc.'s Application for a Preliminary Injunction. Dkt. No. 9. This application has been fully briefed, and with the benefit of an evidentiary hearing held on May 15, 2019, dkt. no. 23, it is ripe for review. For the following reasons, Plaintiffs' Application for a Preliminary Injunction is **GRANTED**.

AO 72A
(Rev. 8/82)

# FINDINGS OF FACT

## I.   The Randolph-Sheppard Act

1. "Congress enacted the [Randolph-Sheppard Act] in 1936 to 'provid[e] blind persons with remunerative employment, enlarg[e] the economic opportunities of the blind, and stimulat[e] the blind to greater efforts in striving to make themselves self-supporting.'" <u>Ga. Dep't of Human Res. v. Nash</u>, 915 F.2d 1482, 1483 (11th Cir. 1990) (quoting Ch. 638, 49 Stat. 1559, 1559 (1936) (codified at 20 U.S.C. § 107(a) (1982))).

2. To accomplish this goal, the Randolph-Sheppard Act ("RSA") gives blind persons "priority in the bidding of contracts 'to operate vending facilities on any Federal property.'" <u>Kan. by & through Kan. Dep't for Children & Families v. SourceAmerica</u>, 874 F.3d 1226, 1231 (10th Cir. 2017) (quoting 20 U.S.C. § 107(a)).[1]

---

[1] Throughout this Order, the Court cites to this Tenth Circuit case and the related lower district court decisions from the District of Kansas, <u>see Kansas v. United States</u>, No. 15-CV-04907-DDC-KGS, 2016 WL 3129397, at *1 (D. Kan. Feb. 26, 2016), <u>supplemented sub nom. Kansas v. United States</u>, 171 F. Supp. 3d 1145 (D. Kan. 2016), <u>aff'd in part sub nom. Kan. by & through Kan. Dep't for Children & Families</u>, 874 F.3d at 1226; <u>State of Kansas v. United States</u>, 192 F. Supp. 3d 1184, 1187 (D. Kan. 2016), <u>aff'd in part sub nom. Kan. by & through Kan. Dep't for Children & Families</u>, 874 F.3d at 1226, as persuasive authority. It is important to note, however, that while the District of Kansas granted a preliminary injunction in a similar RSA challenge to this case, the Tenth Circuit affirmed on the issue of jurisdiction and exhaustion, and the arbitration panel ultimately found that the United States had violated the RSA, on appeal to the Eastern District of Virginia, the district court overturned the arbitration panel's decision. <u>See SourceAmerica v. United States Dep't of Educ.</u>, 368 F. Supp. 3d 974, 983, 992-995 (E.D. Va. 2019). The district court reasoned that because the contract at issue in that case did not involve the blind vendor "operating" the dining services contract, then under the express language of the statute and its implementing regulations, the RSA did not apply. <u>Id.</u> at 992-995. The court also overturned the decision on the merits for several other reasons not relevant to this action. <u>Id.</u> at 995-1000. However, despite the Eastern District of Virginia's conclusions in <u>SourceAmerica</u>, the

AO 72A
(Rev. 8/82)

3. "Although the RSA applies to all federal agencies, Congress charged the Secretary of the Department of Education (DOE) with administering, interpreting, enforcing, and resolving disputes arising under the RSA." Id. (citing 20 U.S.C. §§ 107(b), 107a, 107d-1).

4. The RSA provides that "[t]he Secretary, through the Commissioner, shall prescribe regulations to establish a priority for the operation of cafeterias on Federal property by blind licensees when he determines, on an individual basis and after consultation with the head of the appropriate installation, that such operation can be provided at a reasonable cost with food of a high quality comparable to that currently provided to employees, whether by contract or otherwise." 20 U.S.C. § 107d-3 (e).

5. "Those regulations provide that all contracts 'pertaining to the operation of cafeterias on Federal property' are subject to the RSA." Kan. Dep't for Children & Families, 874 F.3d at 1231 (quoting 34 C.F.R. § 395.33(c)).

6. "Under the RSA, the Secretary designates a State Licensing Agency (SLA) in each state to issue licenses to qualified blind persons to operate vending facilities on federal property." Id.

---

Court still cites the Tenth Circuit and District of Kansas decisions on the preliminary injunction issue as persuasive authority because whether the RSA applies in this case where the blind vender will operate the entire contract is not at issue. Thus, for the purposes of this Order, the Kansas cases remain quite instructive.

(citing 20 U.S.C. § 107a(a)(5)). The Tenth Circuit has summarized how a designated SLA works with a blind vendor and a federal agency to procure vending-facilities services as follows:

> When a federal agency procures vending-facility services, it does not contract directly with a blind vendor. The agency instead negotiates a contract directly with the SLA or solicits competitive bids for the contract. If the federal agency solicits bids, it must invite the SLA to bid on the contract. The SLA then selects a licensed blind vendor and submits a bid on that vendor's behalf if the vendor can provide services "at comparable costs and of comparable high quality." If the SLA's bid is "within a competitive range and has been ranked among those proposals which have a reasonable chance of being selected for final award," then the procuring agency must consult with the Secretary. The Secretary must then give priority to the blind vendor if she determines that the "operation can be provided at a reasonable cost" and at a comparatively "high quality." If the SLA and its blind vendor are awarded the contract, then the blind vendor operates the dining facility and manages the day-to-day operations.

Kan. Dep't for Children & Families, 874 F.3d at 1231-32 (quoting 34 C.F.R. § 395.33(a),(b)).

7. The RSA also "provides for arbitration of all disputes between an SLA and a federal agency that has solicited vending-facility services." Id. The Act states that whenever any SLA determines that any federal agency "is failing to comply with the provisions" of the RSA, the SLA "may file a complaint with the [Secretary of Education] who shall convene a panel to arbitrate the dispute pursuant to section 107d-2 of this title." 20 U.S.C. § 107d-1(b). If the arbitration panel finds the

4

agency to have violated the RSA, then the head of the federal agency at issue "shall cause such acts or practices to be terminated promptly and shall take such other action as may be necessary to carry out the decision of the panel." Id. § 107d-2(b)(2).

8. "The arbitration panel's decision is subject to judicial review as a final agency action under the Administrative Procedure Act (APA) . . . see 5 U.S.C. § 706(2)(A)." Kan. Dep't for Children & Families, 874 F.3d at 1232.

## II. The Solicitation and Plaintiffs' Bid

9. On July 31, 2018, the United States Navy ("the Navy") issued a Solicitation, Solicitation No. N68836-18-Q-0099, for a new dining facilities contract ("the Solicitation") at the Naval Submarine Base, Kings Bay, Georgia ("Naval Base"), which requested proposals by August 23, 2018. Dkt. No. 9-1 ¶ 4; Dkt. No. 12-3.

10. At that time, the dining facilities services were being provided by Plaintiff Base Services of Athens, Inc. ("BSA"). Dkt. No. 12-1 ¶ 4.

11. The incumbent contractor, BSA, saw an opportunity to team with The Georgia Vocational Rehabilitation Agency ("GVRA") (collectively "Plaintiffs")—Georgia's SLA under the RSA—to participate in the RSA program and continue to help GVRA operate the contract. Transcript (hereinafter "TR") 72, Dkt. No. 22.

AO 72A
(Rev. 8/82)

12.  BSA and GVRA agreed that BSA would provide technical and management assistance to GVRA for preparing a proposal for and performing the contract awarded by the Solicitation. _Id._

13.  Although the exact relationship between GVRA and BSA is unclear, the evidence shows the following: GVRA and BSA agreed to submit a proposal for the Solicitation and had an unwritten agreement to operate the contract if GVRA won the award; GVRA, as the designated SLA for Georgia and with the assistance of BSA's incumbent status and expertise, drafted and submitted a bid for the Solicitation; BSA would continue to work on the Naval Base performing the same dining services under the new contract; BSA would train and mentor a new blind manager to operate the entire contract on the base. TR 84-87, 99-101, 104-05, 108-109.

14.  GVRA had already contacted the Navy, specifically the Fleet Logistics Center Jacksonville ("FLCJ") that handles these contracts, to notify the agency of its interest in competing for the Solicitation on March 14, 2018, and the FLCJ determined that the Solicitation was subject to the provisions of the RSA. Dkt. No. 12-1 ¶ 6.

15.  The Solicitation indicated that the award would be set aside for small business concerns because it qualified under the HUBZone program, unless it was determined that award should be

made to the SLA under the regulations implementing the RSA.  See Dkt. 12-3 at 80.

16.  The Solicitation also provided that "[p]ursuant to 20 USC 107 and 34 CFR 395.33, a Randolph-Sheppard Act (RSA) State Licensing Agency (SLA) that submits an offer will be granted a priority in the source selection.  If an SLA submits an offer that is in the competitive range, the Contracting Officer may initiate discussions solely with the SLA for the purpose of facilitating an award to the SLA without further consideration of the other Offerors."  Id.  A contracting officer, Libia Cristancho, sent an email to GVRA on behalf of FLCJ stating the same and requesting some additional information after Plaintiffs submitted their proposal.  Exhibit 7.

17.  Four entities, including GVRA, bid on the Solicitation, and GVRA's proposal presented the highest price.  Defendants' maintain that GVRA's initial price was $134,700 per month.  Dkt. No. 12-1 ¶ 8.  Plaintiffs contend that it was $134,100 per month.  TR 89.

**III. Competitive Range Determination and Subsequent Negotiations**

18.  The FLCJ Contracting Officer determined that all four offers were among the most highly rated proposals and, therefore, fell into the competitive range.  Dkt. No. 12-1 ¶ 8.  As such, FLCJ entered into sole-source discussions with GVRA for the purpose

AO 72A
(Rev. 8/82)

of facilitating an award to GVRA without further consideration of the other proposals. See Exhibit 7.

19. At this point, FLCJ contacted cost analyst Stacy McClendon and asked her to perform calculations to determine what price would be reasonable for the Solicitation contract. TR 11, 18. Ms. McClendon testified that she was told to review the proposal and negotiate with GVRA. TR 11.

20. To determine whether GVRA's price was "fair and reasonable," Ms. McClendon developed a target price, a minimum price, and a maximum price based on performance data provided by GVRA and BSA and what she understood to be a decrease in the amount of meals served under the new Solicitation contract as compared to BSA's prior contract. TR 18-19. She testified that she was told about the decrease in meals served—what she remembered as a decrease of about 600,000 to 400,000 a year—from the contracting specialist. TR 20.

21. Contrary to Ms. McClendon's understanding, the "Daily Workload Estimate" in the Solicitation, which provides contractors with estimated future information about the anticipated labor costs to use in constructing their bids—including the number of meals—was identical to the estimate given in BSA's prior contract with the Naval Base and with the bridge contracts that BSA subsequently entered into with the Naval Base. See Exhibits 4, 5, 6.

AO 72A
(Rev. 8/82)

22. In other words, any alleged drop in meals was not reflected in the "Daily Workload Estimate" of the Solicitation. <u>See</u> <u>Exhibits</u> 4, 5, 6.

23. Moreover, Don James, the CEO of BSA, testified that even if the meal numbers had decreased, such a decrease would not affect operating costs as compared to the earlier contract because the dining services labor costs would be about the same. TR 76. That is, even if meals served decrease from 600,000 to 400,000, the cost to the operator to serve these meals would not decrease much, if at all.

24. Regarding Ms. McClendon's minimum, target, and maximum price values, she testified that the minimum and maximum would be about five percent below and above the target price. TR 24.

25. With her minimum, target, and maximum price values in hand, Ms. McClendon held two conference calls on the same day with Charlie Garrett from GVRA, Don James for BSA, and others to discuss GVRA's proposal. TR 89-91, 107.

26. Ms. McClendon testified that after speaking with Plaintiffs' representatives during the call, she was concerned about the explanations given for "some cost elements and no explanations on others," specifically the lack of explanation for profit increase and the general and administrative rate. TR 35-36. She also testified that Plaintiffs refused to lower their initial bid price, so the conversation ended with her telling

AO 72A
(Rev. 8/82)

Plaintiffs that she would let the contracting officer know. TR 26, 34. Based on the phone conversation and the explanations given by Plaintiffs' representatives, Ms. McClendon determined that their proposal was not fair and reasonable. TR 35.

27. Ms. McClendon's testimony was contradicted by two witnesses. Don James and Charlie Garrett testified that they did lower their price two times to a final number of $130,000. TR 88, 90, 109.

28. Both Mr. James and Mr. Garrett explained that their higher price of $134,100 was predominantly due to the addition of a blind manager who would be trained and mentored by BSA and would operate the contract. TR 85-87, 108-109. The addition of the blind manager added $6,000 per month to the contract bid.[2] TR 89.

29. Mr. James and Mr. Garrett testified that FLCJ wanted them to substitute the blind manager for one of BSA's two existing managers, but both of them testified that because of the complexities of operating a dining services contract on a large military base like the Kings Bay Naval Station, the blind manager would not have the knowledge necessary to perform either of the other two managers' jobs. TR 87-89, 108-109.

---

[2] This fact is supported by Mark Brock's letter to Plaintiffs, dkt. no. 9-1, which explains that one of the reasons that Plaintiffs' bid was rejected was that GVRA "proposed another level of management as a Contract Manager," which would have increased the staff from 32 to 33 full time members. Id.

30. Mr. James and Mr. Garrett testified that they lowered their bid in an effort to alleviate FLCJ's concerns about the price of including the blind manager. TR 88-90, 108-109.

31. Mr. Garrett testified that the conversation ended with FLCJ's representatives saying that they would talk about it and get back to them, but FLCJ never gave a counter offer or continued negotiations. TR 109-110.

32. Based on Ms. McClendon's determination that GVRA's proposal was not fair and reasonable, FLCJ sent GVRA a letter on January 22, 2019, informing GVRA that FLCJ had eliminated GVRA's bid from the competitive range because it determined that GVRA's proposal was "no longer considered to be among the most highly rated proposals being considered for award" and was not "ranked among those proposals which have a reasonable chance of being selected for final award." Dkt. No. 9-1 (Letter from Mark Brock). Mark Brock, the Director of Large Service Contracts for FLCJ and the contractor officer for the Solicitation, testified that had GVRA's price been reasonable, it would have been awarded the contract. TR 70-71.

33. It is undisputed that neither FLCJ nor anyone else with the Navy consulted with the Secretary of Education before eliminating GVRA's bid from consideration. See Dkt. No. 12 at 16-17.

AO 72A
(Rev. 8/82)

## III. Prior Contract and Bridge Contracts

34. BSA's initial contract with the Naval Base ran from 2015 until September 30, 2018 for a price of $125,502 per month. TR 14; Ex. 1.

35. The cost of the contract for food services at the Naval Base increases each year because the cost of labor increases each year pursuant to a collective bargaining agreement between the contractor and the employee union. Pursuant to the contract, the Navy makes equitable adjustments in the price of the contract to account for increased labor costs. TR 17, 94. These adjustments are made on October 1st of each year. Exhibit 3.

36. While GVRA's bid for the Solicitation was still pending, the Naval Base entered into a bridge contract with BSA to continue operating dining services on the base from October 1, 2018 until January 31, 2019 for a price of $127,642 per month, which was the same price as the initial three-year contract with BSA plus a three-percent increase pursuant to the collective bargaining agreement with the union.

37. The Navy considered this price to be reasonable. TR 30. The Navy must certify that all contract prices are fair and reasonable. TR 55.

38. Don James testified that he did not increase the price for the first bridge proposal because he believed its purpose was

AO 72A
(Rev. 8/82)

just to allow BSA and the Naval Base to finish negotiations for a longer five-year contract. TR at 93.

39. BSA and the Navy entered into a second bridge contract for the period of February 2019 to May 31, 2019 for a price of $132,700 per month. TR 92-93; Exhibit 1. Don James testified that this increased price reflected the temporary nature of a bridge contract and the inherent risks involved. TR 93.

40. A third bridge contract was proposed by the Navy for the period of June 1, 2019 to May 31, 2020 for the price of $128,855. TR 7, 15; Exhibit 1. This proposed third bridge contract has not been executed.

## IV. Procedural History

41. On March 26, 2019, GVRA initiated arbitration pursuant to the RSA by filing a Request for Arbitration with the Department of Education arguing that by removing GVRA's bid from consideration, failing to award the contract to GVRA, and failing to consult the Secretary of Education, the Navy violated the RSA. Dkt. No. 9-1 (GVRA's Request for Arbitration). This arbitration has not yet commenced as the Department of Education has yet to send notice to Plaintiffs or the Navy. TR 113.

42. On April 1, 2019, Plaintiffs filed a Complaint and Motion for Preliminary Injunction Relief, Dkt. Nos. 1, 2, and on April 5,

2019, Plaintiffs filed their Application for a Preliminary Injunction, dkt. no. 9.

43. The Court held an evidentiary hearing on May 15, 2019. Dkt. No. 22-23.

44. Don James testified that BSA would be willing to perform the bridge contract pending the conclusion of the arbitration for $130,000 per month. TR 99.

## LEGAL STANDARD

"A preliminary injunction is an extraordinary remedy never awarded as of right." Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 24 (2008) (citing Munaf v. Geren, 553 U.S. 647, 689-90 (2008)). To receive a preliminary injunction, the plaintiff must establish the following requirements: "(1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable injury; (3) that the threatened injury to the plaintiff outweighs the potential harm to the defendant; and (4) that the injunction will not disserve the public interest." Palmer v. Braun, 287 F.3d 1325, 1329 (11th Cir. 2002) (citing Suntrust Bank v. Houghton Mifflin Co., 268 F.3d 1257, 1265 (11th Cir. 2001)).

The plaintiff must clearly meet the burden of persuasion on each of these four factors. Four Seasons Hotel & Resorts, B.V. v. Consorcio Barr, S.A., 320 F.3d 1205, 1210 (11th Cir. 2003). When a court issues an injunction, the court's order must "state the

AO 72A
(Rev. 8/82)

reasons why it issued," "state its terms specifically," and "describe in reasonable detail—and not by referring to the complaint or other document—the act or acts restrained or required." Fed. R. Civ. P. 65 (d)(1). Finally, "where facts are bitterly contested and credibility determinations must be made to decide whether injunctive relief should issue, an evidentiary hearing must be held." <u>McDonald's Corp. v. Robertson</u>, 147 F.3d 1301, 1312 (11th Cir. 1998).

## CONCLUSION OF LAW

### I. Whether the Court Can Issue a Preliminary Injunction in This Case

Before reaching the merits of Plaintiffs' request for a preliminary injunction, the Court will address the issues of jurisdiction and this Court's authority to issue a preliminary injunction in this case. Defendants' arguments that injunctive relief is not available in this action also merit discussion. Specifically, Defendants argue that injunctive relief is unavailable in this case because Plaintiffs have not established a viable district court claim in that the injunction is a "stand-alone" injunction—i.e., not tethered to any claim on the merits pending in this Court. Defendants also argue that such relief is improper because Plaintiffs have not exhausted their administrative remedies and BSA is not a proper party to this action.

## A. Jurisdiction and Authority

In this case, the Court has jurisdiction over Plaintiffs' request for a preliminary injunction pursuant to its authority to review the arbitration panel's decision under the RSA and the APA and its incidental equitable jurisdiction to impose temporary restraint to preserve the status quo pending the ripening of the claim for judicial review. As an initial matter, the United States is immune from suit unless it "expressly and unequivocally waives its sovereign immunity." Kan. Dep't for Children & Families, 874 F.3d at 1240 (citing United States v. Mitchell, 445 U.S. 535, 538 (1980)). However, the APA contains a limited waiver of sovereign immunity which allows "'[a] person suffering legal wrong because of agency action' to 'seek[ ] relief other than money damages' in federal court." Id. (quoting 5 U.S.C. § 702). Moreover, "[t]he RSA gives this Court authority to review the arbitration panel's decision as a final agency action under the [APA]." Ga. Vocational Rehab. Agency Bus. Enter. Program v. United States, No. 4:18CV148, 2019 WL 279992, at *4 (E.D. Va. Jan. 22, 2019) (citing 20 U.S.C. § 107d-2).

"Here, [GVRA] sought nonmonetary relief to remedy an alleged wrong inflicted upon it by a federal agency: it requested a preliminary injunction while it sought to remedy in arbitration the [Navy's] alleged violation of the RSA." Kan. Dep't for Children & Families, 874 F.3d at 1240. Because the Court has

AO 72A
(Rev. 8/82)

jurisdiction to review the arbitration panel's decision under the RSA and the APA, it also has incidental equitable jurisdiction to issue injunctive relief to maintain the status quo while the underlying arbitration is pending. As explained by a court in the Western District of Texas that presided over a similar case, "[b]ecause the power to enter a preliminary injunction pending the resolution of an administrative proceeding is 'merely incidental to the courts' jurisdiction to review final agency action[,]' '[if] a court [has] jurisdiction of the substantive claim, the court's incidental equitable jurisdiction . . . gives the court authority to impose a temporary restraint in order to preserve the status quo pending ripening of the claim for judicial review.'" Johnson v. United States, No. EP-14-CV-00317-DCG, 2014 WL 12540469, at *4 (W.D. Tex. Sept. 12, 2014) (quoting Colo. Dep't of Human Serv. v. United States, 74 Fed. Cl. 339, 347 (2006)). In other words, if a district court will "eventually have jurisdiction of the substantive claim," such as review of an arbitration panel's decision, then the Court has the authority to grant injunctive relief to maintain the status quo pending the outcome of that arbitration panel's decision. See Colo. Dep't of Human Serv., 74 Fed. Cl. at 347 ("Thus, in order to grant the type of preliminary injunction that plaintiffs seek, this Court must 'eventually' have jurisdiction over plaintiffs' substantive claims. Put another way, the Court must ask whether it will have jurisdiction to review the

AO 72A
(Rev. 8/82)

arbitration panel's decision at the conclusion of the arbitration proceedings.").

Based on this reasoning, other courts have determined that a district court has jurisdiction to issue a temporary restraining order or grant a preliminary injunction to maintain the status quo while an SLA's challenge under the RSA is pending before an arbitration panel. See Kan. Dep't for Children & Families, 874 F.3d at 1252; Kentucky v. United States ex rel. Hagel, 759 F.3d 588, 600 (6th Cir. 2014); Kansas v. United States, No. 15-CV-04907-DDC-KGS, 2016 WL 3129397, at *3 (D. Kan. Feb. 26, 2016), supplemented sub nom. Kansas v. United States, 171 F. Supp. 3d 1145 (D. Kan. 2016), aff'd in part sub nom. Kansas, 874 F.3d at 1226; Ga. Vocational Rehab. Agency Bus. Enter. Program v. United States, 354 F. Supp. 3d 690, 701 (E.D. Va. 2018); Ga. Vocational Rehab. Agency Bus. Enter. Program v. United States, No. 4:18CV148, 2019 WL 279992, at *1 (E.D. Va. Jan. 22, 2019); Johnson v. United States, No. EP-14-CV-00317-DCG, 2014 WL 12540469, at *10 (W.D. Tex. Sept. 12, 2014); Fla. by & through Fla. Dep't of Educ. v. United States by & through Mattis, No. 3:18-CV-422-J-34PDB, 2018 WL 3860142, at *2 (M.D. Fla. Mar. 30, 2018); Haw., Dep't of Human Servs., Div. of Vocational Rehab., Hoopono-Servs. for the Blind v. United States Marine Corps by & through Neller, No. CV 18-00128 LEK-KJM, 2018 WL 2187977, at *5 (D. Haw. May 11, 2018). The Court finds the holdings of these cases to be persuasive. As such, the

Court finds that it has federal question jurisdiction over Plaintiffs' request for a preliminary injunction and the authority to issue such an injunction pursuant to the RSA and the APA. See Kan. Dep't for Children & Families, 874 F.3d at 1252 ("The district court had jurisdiction to issue the preliminary injunction under § 1331 and the RSA, and under the APA's limited waiver of sovereign immunity.").

Defendants nonetheless argue that injunctive relief is not available in this case because a "request for preliminary relief needs to be tethered to a claim on the merits that currently can be and is being pursued in the district court," and here, Defendants argue "Plaintiffs have not asserted any such claim before this Court." Dkt. No. 12 at 9. Defendants base this argument on the idea that "[t]here is no such thing as a suit for a traditional injunction in the abstract," and therefore, any motion for a preliminary injunction "must be based upon a cause of action, such as a constitutional violation, a trespass, or a nuisance." Alabama v. U.S. Army Corps of Eng'rs, 424 F.3d 1117, 1127 (11th Cir. 2005) (quoting Klay v. United Healthgroup, Inc., 376 F.3d 1092, 1097 (11th Cir. 2004)). In essence, Defendants argue that Plaintiffs' request for a preliminary injunction is a "freestanding" request untethered to any claim on the merits, and therefore, because that request is not "the procedure set forth in

federal law," the Court should deny it as improper. Dkt. No. 10-11, 13.

In <u>Ga. Vocational Rehab. Agency Bus. Enter. Program</u>, 2019 WL 279992, at *1, a district court in the Eastern District of Virginia—in a case involving GVRA as a plaintiff—recently considered and rejected this same argument asserted by Defendants. In that case, the defendants relied on a Western District of Oklahoma decision, <u>Ok. Dep't of Rehab. Serv's v. United States</u>, Case No. 5:18cv1197, ECF No. 10 at 3-4 (W.D. Ok. Dec 17, 2018), that held that it would be improper for the court to grant the SLA's temporary restraining order "because the state licensing agency's action constituted a 'suit for traditional injunction in the abstract.'" (citing <u>Alabama</u>, 424 F.3d 1117, 1127 (11th Cir. 2005)). The Eastern District of Virginia Court explained that a "'suit for traditional injunction in the abstract' is the principle that a suit for injunctive relief cannot stand unless it is based upon 'some independent legal right . . . being infringed.'" <u>Ga. Vocational Rehab. Agency Bus. Enter. Program</u>, 2019 WL 279992, at *1 (quoting <u>Alabama</u>, 424 F.3d at 1127). However, the court, disagreeing with the Western District of Oklahoma, concluded that "here, the relief requested does not amount to a 'suit for traditional injunction in the abstract' because the suit for injunctive relief is based on Plaintiffs' independent legal right

to arbitrate the Government's alleged failure to comply with the Randolph Sheppard Act." Id. at *4.

Instead, the court found cases cited by the plaintiff to be more persuasive. Id. at *3. For instance, the court found Randolph-Sheppard Vendors of Am. v. Weinberger, 795 F.2d 90 (1986) (citing Fed. R. Civ. P.65) to be persuasive where "the D.C. Court of Appeals reversed a district court's decision to decide an RSA case on the merits before arbitration but admonished that a plaintiff seeking to preserve its rights under the RSA 'should have sought a stay or an injunction against the contract awards pending arbitration.'" Ga. Vocational Rehab. Agency Bus. Enter. Program, 2019 WL 279992, at *3. Moreover, the court cited Colo. Dep't of Human Serv., 74 Fed. Cl. at 347, for the proposition that the court has incidental equitable jurisdiction to maintain the status quo as discussed above. Ga. Vocational Rehab. Agency Bus. Enter. Program, 2019 WL 279992, at *3. Based on these cases, the court concluded that because the plaintiffs had filed a complaint for arbitration under the RSA, it had jurisdiction pursuant to the APA to issue a preliminary injunction while the arbitration was pending.[3]

---

[3] It is true that the Eastern District of Virginia Court stated in concluding that it had jurisdiction to issue a preliminary injunction that it was maintaining the status quo of the plaintiffs and defendant's "contractual relationship" while the arbitration was pending, and in this case, Plaintiffs do not yet have a contractual relationship with Defendants. Ga. Vocational Rehab. Agency Bus. Enter. Program, 2019 WL 279992, at *3. Nonetheless, this fact does not affect the Court's finding that it has jurisdiction over this

AO 72A
(Rev. 8/82)

The Court finds the Eastern District of Virginia court's analysis to be persuasive, and therefore, the Court likewise finds in this case that "the relief requested does not amount to a 'suit for traditional injunction in the abstract' because the suit for injunctive relief is based on Plaintiffs' independent legal right to arbitrate the Government's alleged failure to comply with the Randolph Sheppard Act." Id. at *4. In other words, Plaintiffs' request for a preliminary injunction is tethered to its rights under the RSA, which they are pursuing through arbitration as required by the RSA. That same statute gives this Court authority to review the arbitration panel's decision. As such, this Court has incidental equitable jurisdiction to maintain the status quo by issuing a preliminary injunction while the arbitration is pending.

Next, Defendants argue that granting Plaintiffs' requested preliminary injunction would be improper because Plaintiffs have failed to exhaust administrative remedies as required by the RSA. To begin, the RSA's arbitration requirement is not jurisdictional, see Kentucky, 759 F.3d at 598-99 ("The bar for establishing a jurisdictional requirement is quite high and not to be inferred

---

case nor its rejection of Defendants' argument that this is a traditional injunction in the abstract. Rather, as explained below, the Court finds that the request for a preliminary injunction is tethered to GVRA's independent legal right to arbitrate the Defendants' alleged failure to comply with the RSA, and because the Court has jurisdiction to review that arbitration decision under the APA, it has incidental equitable jurisdiction to issue a preliminary injunction to maintain the status quo—i.e., BSA's incumbent contractor status at the Naval Base and GVRA's bid for the Solicitation.

AO 72A
(Rev. 8/82)

lightly. For the reasons stated above, we do not believe the Act contains statements sufficient to clear this hurdle and impose a limit on the jurisdiction of federal courts. Thus, we hold that the Act's exhaustion requirement is not jurisdictional."); Kan. Dep't for Children & Families, 874 F.3d at 1250 (finding the RSA's arbitration requirement not jurisdictional). Nonetheless, as a prudential matter, "failure to exhaust administrative remedies is [often] fatal to a suit in federal court." Kan. Dep't for Children & Families, 874 F.3d at 1250 (citation omitted); Kentucky, 759 F.3d at 599 ("Even though the Act's exhaustion requirement is not jurisdictional, it has bite."). But, "judicially created exhaustion requirements are 'subject to numerous exceptions.'" Id. (citation omitted). District courts have discretion to excuse exhaustion, and "[i]n accordance with that discretion the federal courts have recognized at least three prudential exceptions to exhaustion requirements." Kentucky, 759 F.3d at 599. "Exhaustion may be excused if a litigant can show: (1) that requiring exhaustion will result in irreparable harm; (2) that the administrative remedy is wholly inadequate; or (3) that the administrative body is biased, making recourse to the agency futile." Id.; see also Kan. Dep't for Children & Families, 874 F.3d at 1250 ("We permit district courts to excuse a failure to exhaust where '(1) the plaintiff asserts a colorable constitutional claim that is collateral to the substantive issues

23

of the administrative proceedings, (2) exhaustion would result in irreparable harm, and (3) exhaustion would be futile.'" (citation omitted)).

In this case, the Court concludes that the RSA's exhaustion requirement should be excused because Plaintiffs have shown that requiring them to complete arbitration before filing for a preliminary injunction in this Court would result in irreparable harm. "Courts apply the same irreparable harm standard in the failure-to-exhaust context as in the preliminary injunction context." See Kan. Dep't for Children & Families, 874 F.3d at 1250. In defining the likelihood of irreparable harm, the Eleventh Circuit requires that it "must be neither remote nor speculative, but actual and imminent." Siegel v. LePore, 234 F.3d 1163, 1176 (11th Cir. 2000) (quoting Ne. Fla. Chapter of Ass'n of Gen. Contractors of Am. v. City of Jacksonville, 896 F.2d 1283, 1285 (11th Cir. 1990); see also Kan. Dep't for Children & Families, 874 F.3d at 1250 ("For an injury to be irreparable it 'must be both certain and great,' not 'merely serious or substantial.'"). "A plaintiff shows it will suffer irreparable harm if it demonstrates there is 'a significant risk that [it] will experience harm that cannot be compensated after the fact by monetary damages.'" Kan. Dep't for Children & Families, 874 F.3d at 1250 (citations omitted). "For instance, a party suing the government suffers irreparable harm where 'monetary relief might not be available

. . . because of the [government's] sovereign immunity.'" Id. at 1251.

Here, Plaintiffs will experience irreparable harm in the loss of the contract (if they were supposed to be awarded it as they allege), the loss of employees, the economic loss involved in bidding for another contract, and the loss of not being able to bid for the contract after BSA loses its incumbent status. With respect to each of these losses, sovereign immunity bars the arbitration panel or a federal court from awarding Plaintiffs monetary damages even if the panel finds that Defendants violated the RSA. Although economic harm is generally not irreparable, it is here because "requiring [Plaintiffs] to complete arbitration before challenging the [Defendants'] decision" to drop them from the competitive range and not award them the contract "would have resulted in a loss for which there is no remedy—an irreparable harm." Kan. Dep't for Children & Families, 874 F.3d at 1251.

Specifically, Plaintiffs would lose out on the contract award for the Solicitation. Without a preliminary injunction, Defendants will be allowed to award the contract to another party and Plaintiffs will be unable to compete for the contract since it has been eliminated from consideration. See Cardinal Maint. Serv., Inc. v. United States, 63 Fed. Cl. 98, 110 (2004) ("It is well-settled that a party suffers irreparable injury when it loses the opportunity to compete on a level playing field with other bidders.

25

Irreparable injury includes, but is not limited to, lost profits which would flow from the contract.") (citations omitted). If Plaintiffs' allegations are correct and they were supposed to be awarded the contract under the RSA, then they will have lost out on a contract—and therefore the profits of that contract—that they were entitled to be awarded. See SAI Indus. Corp. v. United States, 60 Fed. C. 731, 741 (2004) ("Irreparable injury can be shown in the 'form of lost opportunity to fairly compete for and perform work under the contract, including but not limited to lost profits that would generate therefrom.'"). Thus, by the time the arbitration panel reaches a decision, Plaintiffs will have incurred substantial and unrecoverable lost profits and other costs, even if the panel finds in its favor. See Kan. Dep't for Children & Families, 874 F.3d at 1251 ("As a result, there was a significant risk that Kansas would have suffered great financial harm by the time it eventually prevailed in arbitration."); Johnson, No. EP-14-CV-00317-DCG, 2014 WL 12540469, at *7 (W.D. Tex. Sept. 12, 2014) (finding irreparable harm because of the lost profits of the blind vendor which would also result in lost fees for the SLA, none of which could be remedied if the SLA was successful in arbitration).

Moreover, GVRA teamed with BSA precisely so that it could receive the advantage of submitting a bid for the Solicitation to be performed by the incumbent contractor. TR 72. The loss of

26

incumbent status—which will occur since no new bridge contract has been signed with BSA and GVRA has been eliminated with respect to the Solicitation—will cause an unrecoverable economic loss with respect to phase-in costs. These "phase-in costs" are incurred when the contractor has to higher a new team of employees, train the team, and get security clearances for employees to begin a new dining services contract on a federal property, and all of these costs are either added to the bid price—raising the price of the bid making it less likely to be selected—or absorbed by the contractor—making the contract less profitable. TR 97-98. In other words, loss of incumbent status will result in harm to Plaintiffs in either lost profits or loss of the entire contract. See Kentucky, 759 F.3d at 599 (finding irreparable injury where the United States Army awarded a dining services contract to another bidder and ousted the incumbent blind vendor and SLA).

Finally, GVRA as the SLA under the contract would receive twelve percent of BSA's profits as a set-aside fee, and the federal government through its programs supporting SLAs matches some of the set-aside money by a ratio of three-to-one. As Charlie Garrett testified, GVRA was interested in this contract because of its size since there are not many dining service contracts like it available for GVRA, and it allows the blind vendor to make a decent salary. TR at 111. Thus, if Plaintiffs are forced to wait until the arbitration is completed to seek relief in this Court, even if

GVRA wins at the arbitration and is ultimately awarded the contract, the loss of the incumbent status will increase BSA's costs, decrease its profits, and therefore, decrease the fees and matching funds owed to GVRA. Again, as explained above, none of these monetary losses would be recoverable.

Defendants argue that Plaintiffs have not suffered irreparable harm, in part, because BSA lacks standing in this case and is not a proper party because it does not have privity with the United States, did not solicit for the contract award, and will not receive the ultimate contract if GVRA is successful in the arbitration, and as such, any alleged losses to BSA should not be considered in analyzing irreparable harm. First, as an initial matter, under the framework of the RSA, BSA is either a company teaming with GVRA or a subcontractor who will assist the blind manager in operating the contract to run the dining services and is represented by GVRA as the SLA. This representation includes representing BSA and the blind vendor's interests in the bidding process, the negotiations for the Solicitation, and the subsequent challenge in arbitration. In other words, BSA's interests are intertwined with GVRA's under the framework of the RSA, and GVRA represents BSA as the subcontractor or teaming company assiting

AO 72A
(Rev. 8/82)

the blind vendor in operating the contract, and as explained above, injuries to BSA directly affect GVRA.[4]

Nevertheless, the Court also determines that BSA has standing in this action. To have standing to pursue an action in federal court,

> a plaintiff must meet three requirements. First, he must have suffered an injury in fact: an invasion of a legally protected interest. The injury must be concrete and particularized and actual or imminent, not conjectural or hypothetical. Second, there must be a causal connection between his injury and the conduct he challenges, i.e., his injury must be fairly traceable to the challenged actions of the defendant. Third, it must be likely that plaintiff's injury will be redressed by a favorable decision of the court.

*Sicar v. Chertoff*, 541 F.3d 1055, 1059 (11th Cir. 2008). First, as explained above, BSA has suffered an injury in fact in that BSA, as the incumbent contractor, should have continued providing dining services under the new Solicitation award in conjunction with GVRA. Because GVRA, and thus BSA, was eliminated from the selection process, BSA will now lose its incumbent status if the contract is awarded to another party, which will result in higher costs, lost profits, and possibly an unsuccessful bid for the Solicitation if Plaintiffs win in the arbitration. Second, a

---

[4] Testimony at the hearing demonstrated that GVRA and BSA agreed to submit a proposal for the Solicitation and had an unwritten agreement to operate the contract if GVRA won the award as either partners for soliciting a bid and running the contract under the RSA or as GVRA being the primary contractor with BSA as the subcontractor for the purposes of the Solicitation. See TR 113-116. Either way, what is clear is that GVRA and BSA are both interested parties in this case, and they are working together to attempt to win a contract to perform dining services pursuant to the RSA at the Naval Base.

AO 72A
(Rev. 8/82)

causal connection exists between BSA's injury and Defendants' alleged wrongful actions because if Defendants violated the RSA by failing to award the contract to Plaintiffs or determining that the proposal was unreasonable and removing it from consideration without at least consulting the Secretary of Education, then that failure resulted in BSA losing its incumbent status as well as lost profits and other costs.[5]  Finally, a decision by this Court to issue a preliminary injunction to maintain the status quo pending the arbitration will result in BSA maintaining its incumbent status, which will allow it to keep its employees already working on the base in place and allow it to not incur substantial phase-in costs when it, through GVRA, bids for the Solicitation upon a successful arbitration challenge.  Thus, the Court determines that BSA has standing in this action, and because BSA has standing, its unrecoverable economic harm that directly impacts GVRA's injuries can be considered.  See Johnson, 2014 WL 12540469, at *9 (rejecting the argument that because the SLA is the actual bidder on the contract, the individual blind vendor lacks standing in a preliminary injunction action to maintain the status quo).

Defendants also argue that unlike other cases where courts have found irreparable harm, this case is distinguishable because

---

[5] At minimum, BSA could have maintained its incumbent status pending review of the proposal by the Secretary of Education.

AO 72A
(Rev. 8/82)

GVRA does not already have a pre-existing dining services contract with the Naval Base. It is true that, unlike this case, many other cases where courts have issued preliminary injunctions to maintain the status quo under the RSA have involved SLAs that had previously been performing a contract at military bases, see, e.g., id. at *1-*2; Kan. Dep't for Children & Families, 874 F.3d at 1230-31; Ga. Vocational Rehab. Agency Bus. Enter. Program, 2019 WL 279992, at *1, but for the purposes of this case, the Court finds that distinction immaterial. The reason it is immaterial is that GVRA, pursuant to the RSA, teamed with an incumbent contractor who would perform the contract with a blind vendor to bid for a solicitation, and like cases where other courts issued preliminary injunctions, Plaintiffs are pursing their rights under the RSA in arbitration, and if they cannot pursue injunctive relief in this court, BSA will lose its incumbent status. While BSA is not currently operating as a blind vendor on the base, were Plaintiffs to be awarded the contract, it would be, and for the reasons described above, BSA being ousted as the incumbent contractor will cause harm to BSA and GVRA if they are ultimately successful in the arbitration. Thus, the fact that Plaintiffs do not already operate an RSA contract on the base does not change the fact that they will suffer irreparable harm.

AO 72A
(Rev. 8/82)

Finally, Defendants argue that Plaintiffs have not suffered irreparable harm because they delayed filing this request for a preliminary injunction. Specifically, Defendants argue that Plaintiffs waited more than two months before seeking injunctive relief after finding out that they had been eliminated from the bidding process for the Solicitation. To support this argument Defendants cite Fla. Dep't of Educ. Div. of Blind Servs. v. United States by & through Carter, No. 3:15CV203-MCR/CJK, 2015 WL 13387584, at *1 (N.D. Fla. Apr. 30, 2015), in which the district court denied the SLA's motion for a temporary restraining order because the SLA filed the order the day before the contract with the Air Force was set to expire.

Although it is generally true that "a party's failure to act with speed or urgency in moving for a preliminary injunction necessarily undermines a finding of irreparable harm," Wreal, LLC v. Amazon.com, Inc., 840 F.3d 1244, 1248 (11th Cir. 2016) (finding a delay mitigating irreparable harm where plaintiff waited five months to file), in this case, the Court finds that Plaintiffs did not delay filing for a preliminary injunction such that it undermines their arguments for irreparable harm. Rather, Plaintiffs only waited about two-and-a-half months after finding out that they were eliminated for consideration before filing for preliminary relief. The Court considers that roughly two-and-a-half-month period to be a reasonable time for Plaintiffs to

32

consider their options under the RSA and decide to prepare for and pursue injunctive relief while their arbitration was pending. Moreover, unlike the Fla. Dep't of Educ. Div. of Blind Servs. case where the SLA waited until the day before the contract expired, Plaintiffs in this case filed their initial Complaint about two months prior to the expiration of the current bridge contract between BSA and the Naval Base, which occurs on May 31, 2019. For these reasons, the Court finds that the approximately two-and-a half-month delay does not warrant a finding that Plaintiffs have not shown irreparable harm.

For all of these reasons, the Court determines that the irreparable harm exception to the RSA's exhaustion requirement applies.[6] As such, not only does this Court have jurisdiction over Plaintiffs' request for a preliminary injunction, but also, such requested relief is properly before this Court and available to Plaintiffs. As a result, the Court now turns to the merits of the request for injunctive relief.

## II. Preliminary Injunction Requirements

### A. Likelihood of Success on the Merits

The first requirement that the movant demonstrate a substantial likelihood of success on the merits "is generally

---

[6] As explained above, the Court also determines that BSA has standing in this action, and its injuries can be considered for the purposes of the irreparable harm exception.

AO 72A
(Rev. 8/82)

considered the most important of the four." White v. Alcon Film Fund, LLC, 955 F. Supp. 2d 1381, 1383 (N.D. Ga. 2013) (citing Garcia-Mir v. Meese, 781 F.2d 1450, 1453 (11th Cir. 1986)). Here, Plaintiffs' substantive claim before the arbitration panel is that Defendants violated the RSA by not awarding them the contract and not consulting the Secretary of Education before removing Plaintiffs' bid from the competitive range. In response, Defendants, pointing to the language of 34 C.F.R. § 395.33(b), argue that Plaintiffs were never entitled to the contract under the RSA and that they did not have to consult with the Secretary of Education. Defendants contend that although Plaintiffs' bid was within the competitive range, it was removed after it was determined that the price was unreasonable and therefore not ranked among those proposals which have a reasonable chance of being selected for a final award.

1. **Plaintiffs Are Likely to Succeed on the Merits if Their Interpretation of 34 C.F.R. § 395.33 is Correct.**

To begin, the Court finds that Plaintiffs are substantially likely to succeed on the merits of their claim because it appears based on other cases, other arbitration decisions under the RSA, Department of Defense and Navy internal regulations, and the general language of the RSA that once Plaintiffs' bid was

determined to be within the competitive range, they were either to

be awarded the contract or have the bid reviewed by the Secretary

of Education to determine if an exception applied.  RSA regulation

34 C.F.R. § 395.33(a)-(b) provides:

> (a) Priority in the operation of cafeterias by blind vendors on Federal property shall be afforded when the Secretary determines, <u>on an individual basis</u>, and after consultation with the appropriate property managing department, agency, or instrumentality, that such operation can be provided at a reasonable cost, with food of a high quality comparable to that currently provided employees, whether by contract or otherwise. Such operation shall be expected to provide maximum employment opportunities to blind vendors to the greatest extent possible.

> (b) In order to establish the ability of blind vendors to operate a cafeteria in such a manner as to provide food service at comparable cost and of comparable high quality as that available from other providers of cafeteria services, the appropriate State licensing agency shall be invited to respond to solicitations for offers when a cafeteria contract is contemplated by the appropriate property managing department, agency, or instrumentality. Such solicitations for offers shall establish criteria under which all responses will be judged. Such criteria may include sanitation practices, personnel, staffing, menu pricing and portion sizes, menu variety, budget and accounting practices. <u>If the proposal received from the State licensing agency is judged to be within a competitive range and has been ranked among those proposals which have a reasonable chance of being selected for final award, the property managing department, agency, or instrumentality shall consult with the Secretary as required under paragraph (a) of this section.</u> If the State licensing agency is dissatisfied with an action taken relative to its proposal, it may file a complaint with the Secretary under the provisions of § 395.37.

34 C.F.R. § 395.33(a)-(b) (emphasis added).  Defendants argue that

subsection (b) shows that they only had to consult the Secretary

35

if Plaintiffs were both in the competitive range and had a reasonable chance of being selected. However, Plaintiffs have presented evidence showing that being found to be in the competitive range and being ranked as a proposal having a reasonable chance of being selected are the same requirement within the meaning of 34 C.F.R. § 395.33. In other words, as Plaintiffs assert, being found to be in the competitive range means that a proposal is "highly rated," and a highly rated proposal—or one that is in the competitive range—has a reasonable chance of being selected for an award.

First, Plaintiffs point to older regulations from the Armed Services Procurement Regulations (ASPR), which governed federal acquisitions at the time when the Department of Education implemented its regulations enforcing the RSA, including § 395.33(b), which was prior to the enactment of the Federal Acquisition Regulations. See Shoals Am. Indus., Inc. v. United States, 877 F.2d 883, 886 (11th Cir. 1989) (explaining that the Armed Services Procurement Act of 1947, 10 U.S.C. §§ 2301 et seq., governed procurements by the Department of Defense); see also 23 A.L.R. Fed. 301 (originally published in 1975) ("Federal contracts are usually awarded under the authority of . . . the Armed Services Procurement Act of 1947 (10 U.S.C.A. §§ 2301-2314). [This] statute[] [is] implemented by [the] procurement regulations . . . [of] the Armed Services Procurement Regulations (ASPR), 32 CFR

§§ 1.100 *et seq.*"). The RSA was amended in 1974, and to implement those amendments, the Department of Education promulgated regulations through notice and comment rulemaking in 1977 and 1978. See 42 Fed. Reg. 15802 (1977); 34 C.F.R. 266, 284 (1983). At that time, ASPR 3-805.2, which applied to federal procurements before the FAR was promulgated in 1984, provided that the competitive range "shall include all proposals which have a reasonable chance of being selected for award." To Sellers, Conner & Cuneo, 53 Comp. Gen. 440, 442 (Dec. 28, 1973) (quoting ASPR 3-805.2); see also Sundstrand Corp. & Consol. Subsidiaries v. Comm'r, 98 T.C. 518, 522-23 (1992), aff'd sub nom. Sundstrand Corp. v. Comm'r, 17 F.3d 965 (7th Cir. 1994) (showing that regulatory requirements of the FAR applied after April 1, 1984); see § 27.04[A][1] Armed Services Procurement Act, CCSDN § 27.04[A][1] (explaining that the ASPA applied to procurements prior to the promulgation of the FAR in 1984). Moreover, as Plaintiffs point out, earlier versions of the FAR included all proposals that have a reasonable chance of being selected for a final award within the definition of competitive range. See 48 C.F.R. 234, 294 (1995). Finally, the language of 33 C.F.R. § 395.33(b) that "if the proposal . . . is judged to be within a competitive range and has been ranked among those proposals which have a reasonable chance of being selected for final award" has not changed since the regulation was initially promulgated. Compare 45 C.F.R. 1369.33(b) (1977) and 42 Fed. Reg.

15802 (March 23, 1977) <u>with</u> 34 C.F.R. § 395.33 (2019). Therefore, these earlier regulations suggest that at the time that § 395.33(b) was promulgated, the competitive range was understood to include those preproposals that have a reasonable chance of being selected.

Second, Plaintiffs point to Department of Defense (DOD) regulations and Navy regulations (OPNAVs) that implement the RSA and provide that when an SLA's bid is determined to be within the competitive range, the SLA is awarded the contract unless the on-site official determines an award to the SLA would adversely affect the interest of the United States or that the SLA does not have the capacity to operate the contract and the Secretary of Education approves that determination. <u>See</u> DOD Directive No. 1125.3, Dkt. No. 20-1; OPNAV Instruction 4535.1B § 2.a.(2). However, DOD Directive No. 1125.3 (originally issued in 1978) was reissued in on December 22, 2009, by DOD Instruction 1125.03 and that new directive states that Directive 1125.3 is "hereby canceled." DOD Directive 1125.03 at 4, Enclosure 1, References. The problem is that DOD Directive 1125.03 says that it does not apply to "full food services, mess attendant services, or services supporting the operating of military dining facility," and it says nothing about the blind's priority right to operate cafeterias or anything about a competitive range or selection for contract awards. <u>Id.</u> at 1. Further complicating things, OPNAV Instruction 4535.1B, which is the Navy's implementation of the RSA, is based on DOD Directive

38

1125.3, but unlike DOD Directive 1125.3, OPNAV Instruction 4535.1B is still active. <u>See</u> TR 45 (stating that the Navy is required to follow OPNAV Instruction 4535.1B); Department of the Navy, OPNAV Instructions,

https://www.secnav.navy.mil/doni/opnav.aspx?RootFolder=%2Fdoni%2FDirectives%2F04000%20Logistical%20Support%20and%20Services%2F04-500%20Redistribution%20and%20Disposal%20of%20Property&FolderCTID=0x012000E8AF0DD9490E0547A7DE7CF736393D04&View=%7BCACF3AEF-AED4-433A-8CE5-A45245715B5C%7D (listing OPNAV Instruction 4535.1B as "active" status).

Defendants argue that based on OPNAV Instruction 4535.1B's policy that when regulations conflict, DOD Directive 1125.03 controls, and OPNAV Instruction 4535.1B is not relevant. However, it is not clear that OPNAV Instruction 4535.1B conflicts with DOD Directive 1125.03 since the DOD Directive does not provide any regulations for solicitation and selection of RSA dining service contracts. Thus, at a minimum, the former DOD Directive 1125.3 and the currently active OPNAV Instruction 4535.1B suggest that once an SLA is determined to be in the competitive range, it is to be awarded the contract unless two exceptions apply which both require review by the Secretary of Education—a review which did not occur in this case.

AO 72A
(Rev. 8/82)

Third, other cases involving the RSA appear to support Plaintiffs' argument that once they were determined to be within the competitive range, they should have been awarded the contract or at least had their bid reviewed by the Secretary before it was removed from consideration. See Ga. Vocational Rehab. Agency Bus. Enter. Program, 2019 WL 279992, at *5 ("As noted in the CFR, the Government was only required to consult the Secretary after a determination that the bid was 'judged to be within a competitive range.'"); N.C. Div. of Servs. For the Blind v. United States, 53 Fed. Cl. 147, 164 (2002), aff'd sub nom. N.C. Div. of Servs. for the Blind v. United States, 60 F. App'x 826 (Fed. Cir. 2003) (treating competitive range and reasonable chance of being selected as the same thing); Kentucky, 759 F.3d at 592 ("If the state licensing agency's proposal, according to neutral, pre-published criteria, is within 'a competitive range' and the Department of Education ("DOE") agrees with the state licensing agency's assessment of the vendor's qualifications, the blind vendor will be awarded the contract." (citing 34 § 395.33(a), (b)). Moreover, arbitration panels have also concluded that under the RSA, the United States must consult with the Secretary of Education before removing from consideration an SLA determined to be within the competitive range. See Ga. Vocational Rehab. Agency Bus. Enter. Program, 2019 WL 279992, at *4-5 ("In the Colorado Arbitration, the State Licensing Agency was eliminated from the

competitive range because of price, and the Air Force did not consult with the Secretary of Education at any time about the issue of price reasonableness. The arbitration panel found that 'the Air Force Violated 34 C. F. R. § 395.33(a) when it failed to consult with the Secretary of Education.' The panel further reasoned that 'even if the state licensing agency's bid is not within the competitive range set by the contracting agency, the matter still must be returned to the Secretary to decide, after consulting with the contracting agency, if the blind vendor can provide an operation at a reasonable cost, with food of a high quality.' Similarly, in the Ohio Arbitration, the Ohio Arbitration panel majority ruled that '[t]he statutory and regulatory scheme make it clear that an SLA's bid cannot be rejected without consulting with the Secretary of Education who makes the final decision. 34 C.F.R. § 395.33(a).'" (quoting Colo. Dep't of Human Servs. Div. of Vocational Rehab. Bus. Enter. Program, Case No. R-S/10-06 (May 20, 2012), and Opportunities for Ohioans with Disabilities v. United States Dep't of the Air Force, No. R-S/16-08 (Feb. 22, 2018))).

Finally, Don James and Charlie Garrett testified that in their years of experience dealing with contracts under the RSA, it was their understanding that the SLA was always awarded the contract after their price was determined to be within the competitive range. See TR 82, 105. Don James also testified that he understood, based on his experience, that being in the competitive

range was synonymous with having a reasonable chance of being selected for a final award. TR 81-82. Finally, Mark Brock in response to the question of "if you're one of the highly, most highly rated bids, does that mean you've got a reasonable chance of receiving the award; is that why you're in the competitive range?" answered "[y]ou have a reasonable chance." TR 71. While these individuals' understanding of how the RSA operates is not controlling, it is relevant and supports Plaintiffs' position.

Based on all of this, the arbitration panel could likely find that Defendants violated the RSA by not awarding Plaintiffs the contract after they were determined to be in the competitive range or by not at least consulting with the Secretary of Education. Plaintiffs have pointed to regulatory history, case law, arbitration decisions, and evidentiary testimony to support their view. If Plaintiffs are correct, and the Court finds that there is a substantial likelihood that they are, then once their bid was determined to be within the competitive range, pursuant to the RSA, Defendants should have either awarded them the contract or consulted with the Secretary to see if an exception applied. Defendants did neither of these things.

> ### 2. Even if Defendant's Interpretation of 34 C.F.R. § 395.33 is Correct, Plaintiffs Are Still Likely to Succeed on the Merits

Defendants have pointed to some evidence that supports their view that before they were required to consult the Secretary, Plaintiffs' bid not only had to be within the competitive range, but also had to be ranked among those proposals with a reasonable chance of being selected. The current FAR provisions governing federal government procurements generally contemplate the ability of the government, even after determining that a bidder is within the competitive range, to remove a bid from the competitive range if it is determined to be unreasonable. FAR 15.306(c)(3) provides that

> (3) If the contracting officer, after complying with paragraph (d)(3) of this section, decides that an offeror's proposal should no longer be included in the competitive range, the proposal shall be eliminated from consideration for award. Written notice of this decision shall be provided to unsuccessful offerors in accordance with 15.503.

48 C.F.R. § 15.306. Thus, this section contemplates the ability of a contracting officer when making government procurements of contracts to remove a bid from the competitive range.[7] Additionally, at least one case from the United States Court of Federal Claims, in the similar context of a bid protest under the

---

[7] It should be noted that the FAR governs the procurement of government contracts generally, but those regulations do not implement the provisions of the RSA. In other words, the RSA and its implementing regulations have been passed in addition to and separate from the FAR regulations. The Court points this fact out to note that while the FAR may provide regulations for the procurement of government contracts generally, Congress passed the RSA to change the normal government contracting procedures for the benefit of the blind, and as such, the RSA might require a different result than the general FAR regulations would otherwise with certain government contracts. Nevertheless, for the purposes of this section, the FAR appears to contemplate the ability of a contracting officer to remove a bid from the competitive range.

AO 72A
(Rev. 8/82)

RSA, rejected the argument that once an SLA's bid is determined to be within the competitive range, it must be awarded the contract. State v. United States, 134 Fed. Cl. 8, 22 (2017). Moreover, the court also treated the language of having a reasonable chance of being selected for the final award as being a separate and independent requirement. Id. at 23 ("There is no indication in the record before the court, thus far, that the State of Texas has been ranked by the Air Force as 'among those proposals which have a reasonable chance of being selected for final award' based on price and technical acceptability so as to trigger the Air Force's obligation before award to consult with the United States Secretary of Education." (quoting 34 C.F.R. § 395.33(b)). Nevertheless, the Court of Federal Claim's decision appeared to contemplate that the Secretary of Education would have a final say in the matter before a contract was awarded under the RSA, whether under 33 C.F.R. § 395.33(a) or § 395.33(b). See id. at *23 ("The Air Force has not yet completed its evaluation process, as set forth in the solicitation, or consulted with the United States Secretary of Education regarding contractor selection, nor has the United States Secretary of Education had the opportunity to make her determination, as required by 34 C.F.R. § 395.33(a).").

Assuming based on the current FAR provisions and the State v. United States decision that Plaintiffs do not get an automatic award if they are determined to be within the competitive range

and that Defendants' interpretation of § 395.33(b) is correct, the Court finds that Plaintiffs are still substantially likely to succeed on the merits because their bid price was likely reasonable—meaning that Defendants had to at minimum consult with the Secretary of Education before removing their bid from consideration. This is so based on the credible evidence produced during the hearing and the cases cited herein. The arbitration panel could likely find that based on the facts presented in this case, Plaintiffs' proposal was reasonable, and, as such, their bid had a reasonable chance of being selected. In other words, the arbitration panel could likely conclude that Defendants' determination that Plaintiffs' bid price was unreasonable was erroneous. Ga. Vocational Rehab. Agency Bus. Enter. Program, 2019 WL 279992, at *1, *7 (finding that SLA was substantially likely to succeed on the merits where government failed to follow its own regulations for determining which proposals should be included in the competitive range and determined that although the SLA's bid was technically acceptable, its price was unreasonable.). Thus, because Defendants failed to consult the Secretary in any respect, they likely violated the RSA.

First, Plaintiffs' bid was likely reasonable because there is credible evidence that they lowered the original bid price that was initially determined to be within the competitive range twice during negotiations with Defendants. During the evidentiary

hearing, both parties presented conflicting testimony on this point. Stacy McClendon testified that after the Navy entered into sole-source negotiations with Plaintiffs, Plaintiffs refused to lower their price at all for the Solicitation bid. TR 26-27, 34. Don James and Charlie Garrett who were also on the call testified that they lowered their bid, not just once, but twice. TR 90, 109. Considering the credibility of the witnesses' testimonies and the overall weight of the evidence, the Court concludes that Plaintiffs did offer to lower their price. See id. at *7 (explaining that the government's witnesses gave inconsistent statements regarding the process for determining whether a price for an SLA bid was competitive based off of the price of meals at Army base). Specifically, the Court finds credible evidence that Plaintiffs final offer was $130,000 per month. Therefore, if Plaintiffs, after being considered one of the most highly rated proposals and being placed in the competitive range, lowered their price even further, the Court finds that the lower price had a reasonable chance of being selected.

The Court found Ms. McClendon's testimony less persuasive and credible than that of Mr. James and Mr. Garrett. Ms. McClendon stated that she determined that Plaintiffs' bid was unreasonable because of elements that concerned her, namely Plaintiffs' alleged failure to justify its increased profit and the general administrative rate. TR 36. Ms. McClendon based her determination

AO 72A
(Rev. 8/82)

on a price calculation that included a minimum price, maximum price, and a target price allegedly based off of a reduction in meals needed at the base that had changed from the original 2015 contract. TR 18-21. However, in the Solicitation, the number of meals listed under Technical Exhibit Number 2 entitled "Daily Workload Estimates" was identical to the number of meals listed under the same section for the 2015 contract as well as the subsequent bridge contracts. See Exhibits 4-6. Mark Brock testified that the technical exhibits are included in solicitations so that the contractor can know what to expect and "put his bid in accordingly," such as figuring out how many people need meals served. TR 57. Don James testified that these workload estimates are used by the contractors because it tells them "what you're doing going forward" while documents like Technical Exhibit 1, entitled "Hours of Operation," just include historical data. TR 75; Dkt. No. 12-3 at 46-48. Thus, Ms. McClendon was basing her range of reasonable proposals off of an alleged decrease in meals that was not reflected in the Solicitation to bidders. Moreover, Don James testified that a change in the amount of meals, unless an extremely large amount, would not otherwise change the price of a bid because the labor costs would be the same. TR 76-77. So, not only was the basis for Ms. McClendon's target price not included in the Solicitation, but it was also not a reasonable basis for expecting lower costs from dining services bidders for

AO 72A
(Rev. 8/82)

the Solicitation. These facts lead the Court to conclude that Plaintiffs reduced their price to $130,000.

Second, the $130,000 price was likely reasonable in that it was very close to the former contract that BSA had with the Naval Base and close to the bridge contracts that BSA executed with the Naval Base. BSA's prior contract with the Naval Base from 2015 to 2018 was $125,502 per month. TR 14; Ex. 1. Every year, the cost of the contract for dining services at the Naval Base increases because the cost of labor increases annually pursuant to a collective bargaining agreement between the contractor and the employee union; the Navy makes adjustments to the price of the contract to account for this increased cost. TR 17, 78. After the 2018 contract expired, BSA and the Naval Base entered into the first bridge contract from October 2018 to January 2019 for $127,642, which only reflected an increase based on the labor union rates that had increased by three percent. TR 14; Ex. 1. Then, the second bridge was entered into in February 2019 and lasts until May 31, 2019 for a price of $132,700 per month. Don James testified that this increased price reflected the temporary nature of a bridge contract and the inherent risks involved.[8] TR 93. However, Don James did not increase the price in the first bridge because he believed its purpose was just to allow them to finish

---

[8] Mark Brock also confirmed that bridge contracts are typically higher priced. TR 55.

AO 72A
(Rev. 8/82)

negotiations for a longer five-year contract. TR at 93. Finally, the proposed third bridge for June 2019 to May 31, 2020 is $128,855, and that number was offered by the Navy—i.e., it has already been determined to be reasonable for the purposes of that bridge. TR 93-94; Ex. 1.

Based on these numbers, Plaintiffs can likely show that their offer of $130,000 was reasonable. $130,000 is only 1.8% more than the $127,642 that the Navy determined to be reasonable. TR 30, 55. Plaintiffs' $130,000 proposal is even closer to the Navy's proposal of $128,855 for the year-long proposed third bridge. Finally, although the second bridge was only a short three-month contract, the $130,000 is still over $2,000 less per month than that approved price. All of this shows that Plaintiffs' proposal was likely reasonable, especially combined with the fact that they lowered their proposal from about $134,000[9] to $130,000.

Third, Plaintiffs' bid was also likely reasonable because the reason that the price was higher than other agreements between BSA and the Naval Base and other proposals for the Solicitation was because of the added cost of paying a blind manager—i.e., the whole purpose behind dining services contracts under the RSA. Don James

---

[9] Although the Parties dispute whether the initial bid was for $134,100 per month or $134,700 per month, the Court does not find this dispute to be material or necessary to resolve for purposes of this Order. The important point is that whatever the number, it was initially determined to be in the competitive range, and then, the Court has already found that Plaintiffs lowered their bid to $130,000, which is the operative number for determining whether Plaintiffs' proposal was reasonable.

AO 72A
(Rev. 8/82)

testified that BSA historically had two managers operating the dining services contract—an assistant manager and a project manager. TR 86-87. But, when BSA teamed with GVRA to bid for the contract under the RSA, they added a new management position for a blind manager who would be responsible for operating the entire contract. TR 84-88. This fact is supported by Mark Brock's letter to Plaintiffs informing them that their bid was removed from consideration. See Dkt. No. 9-1. Defendants wanted Plaintiffs to substitute the blind manager for one of the existing managers, but as Don James and Charlie Garrett explained, such a substitution would not be possible because although he or she would be trained in operating vending facilities generally, a military contract on a large naval base is much more complicated than other civilian contracts. TR 84-88, 108-109. As such, the blind manager would need to be trained and mentored by the two existing BSA managers on how to operate the contract. Id.

Don James explained that the addition of the blind manager was the main reason for GVRA's initial bid of $134,100[10] on the Solicitation. TR 89. The blind manager cost approximately $6,000 per month. Id. The prior 2015 contract, adjusted for annual union rates, was $127,642, and adding a blind manager for $6,000 per month results in just under $134,000. Id. In passing the RSA,

---

[10] Or $134,700. See supra, note 9.

"Congress intended to provide blind persons with substantive priority over the non-blind to operate vending facilities in federal buildings" and "enacted the Act to provide 'blind persons with remunerative employment,' to enlarge 'the economic opportunities of the blind,' and to stimulate 'the blind to greater efforts in striving to make themselves self-supporting.'" Ga. Dep't of Human Res., 915 F.2d at 1498-99 (quoting 20 U.S.C. § 107(a)). In other words, the RSA was designed to interrupt the normal contracting process to provide priority for blind vendors, which would inherently involve the government paying a higher price than they would if they could just select the lowest bidder. Here, Plaintiffs' bid was a higher price because of the addition of the blind manager who would run the contract. Moreover, in an effort to appease Defendants, Plaintiffs lowered their bid price to $130,000 such that GVRA would absorb the bulk of the cost of mentoring the blind manager. TR 88-90, 109. Nevertheless, even with that concession, Defendants removed Plaintiffs' bid from consideration. Based on these facts, Plaintiffs will likely be able to show the arbitration panel that their bid was reasonable in light of the purpose of the RSA since its higher price was due to the addition of a blind manager.

Finally, Plaintiffs will likely be able to show that Defendants violated the RSA because Defendants failed to abide by the Solicitation's own language that said if an SLA's bid was

determined to be within the competitive range, Defendants would negotiate solely with the SLA for the purpose of facilitating the contract. Specifically, the Solicitation stated that

> Pursuant to 20 USC 107 and 34 CFR 395.33, a Randolph-Sheppard Act (RSA) State Licensing Agency (SLA) that submits an offer will be granted a priority in the source selection. If an SLA submits an offer that is in the competitive range, the Contracting Officer may initiate discussions solely with the SLA for the purpose of facilitating an award to the SLA without further consideration of the other Offerors.

Dkt. No. 12-3 at 80. In addition, after Defendants had received Plaintiffs' initial bid, the contract specialist sent an email to Plaintiffs repeating this exact same language. "Facilitate" means "[t]o make the occurrence of (something) easier; to render less difficult." *Facilitate*, Black's Law Dictionary (10th ed. 2014). Here, Defendants arguably failed to honor this provision of the Solicitation. Based on the facts discussed above, even though Plaintiffs had a price that was relatively near BSA's prior contract and was close to or even less than some of BSA's bridge contracts, the price was higher due to the addition of a blind manager, and Plaintiffs lowered their initial price in an effort to negotiate with Defendants, Defendants still removed Plaintiffs from consideration after two phone call discussions. See TR 107. No evidence in the record suggests that Defendants took steps to make it easier to award the contract to Plaintiffs. Rather, the evidence shows that Defendants established a minimum, maximum, and

target price based on a decrease in meals that was not readily apparent, if present at all, in the Solicitation and determined that Plaintiffs' price was not reasonable based off of that range and two phone calls on the same day. Defendants indicated to Plaintiffs that they would "let the [contracting officer] know" and ended the conversation. TR 34. Defendants did not follow up with Plaintiffs, offer concessions or inducements to get Plaintiffs to lower their price, or otherwise make any efforts to make the occurrence of awarding the contract to Plaintiffs easier. Thus, for this additional reason, Plaintiffs' price (and the lowering of their initial price) was likely reasonable in light of the language of the Solicitation, and Defendants likely violated the RSA by removing Plaintiffs from consideration without at least consulting the Secretary of Education.

In summary, the Court is not tasked with deciding whether or not Defendants violated the RSA. That job is for the arbitration panel. Nevertheless, for Plaintiffs to succeed in their request for a preliminary injunction, they must show that they are substantially likely to succeed on the merits. Based on the facts discussed above, the Court determines that Plaintiffs are substantially likely to succeed on the merits such that preliminary injunctive relief is warranted in this case. If Plaintiffs' position is correct that "competitive range" and "reasonable chance of being selected for final award" mean the same thing and

AO 72A
(Rev. 8/82)

that they are entitled to an award once they're found to be within that range, then Defendants likely violated the RSA since they were deemed to be within the competitive range. Alternatively, even under Defendants' interpretation of those terms as being two separate requirements, Plaintiffs are still likely to succeed on the merits because their proposal was likely reasonable, which means that, at minimum, Defendants had to consult the Secretary of Education before removing Plaintiffs' bid from consideration. Either way, Plaintiffs have a strong case on the merits under the RSA in their arbitration challenge. The first factor weighs in favor of granting Plaintiffs' request.

## B. Substantial Threat of Irreparable Injury

Looking to the second factor, the substantial threat of irreparable injury, the Court has already found that Plaintiffs have shown that they will experience irreparable injury without preliminary injunctive relief to maintain the status quo pending the outcome of the arbitration. See supra Section I.A.; see also Johnson, 2014 WL 12540469, at *8 ("Turning to the second factor, the Court has already determined that irreparable harm is likely to occur absent preliminary relief. This factor supports Plaintiffs as well."); Kan. Dep't for Children & Families, 874 F.3d at 1250 ("Courts apply the same irreparable harm standard in the failure-to-exhaust context as in the preliminary injunction

AO 72A
(Rev. 8/82)

context."). As such, this factor also supports Plaintiffs' request for a preliminary injunction.

## C. The Balance of the Equities

The third preliminary injunction prerequisite requires the Court to compare the harm to the movant in the absence of the preliminary injunction with the harm to the nonmovant in granting the preliminary injunction. Specifically in this case, the Court must determine whether the harm to Plaintiffs of losing out on the contract and the sunk costs and profits involved in losing incumbent status without having any remedy to pursue damages against the United States if they are successful at arbitration outweighs the harm to the United States of not being able to award a contract to another party and maintaining a temporary bridge contract with BSA until the arbitration is completed. In balancing the equites, the Court finds that they weigh in Plaintiffs' favor.

The harm to Plaintiffs has been sufficiently described above. As for the harm to Defendants of being forced to maintain a contract with BSA as opposed to awarding the Solicitation to another party, that harm is mitigated by the fact that BSA is already an incumbent contractor that can continue dining services pending the result of the arbitration. Other courts considering this factor under similar circumstances have reached the same conclusion. See Kansas, 171 F. Supp. 3d at 1157 (finding the

balance weighing in plaintiff's favor because "[w]ith a preliminary injunction, the Army can continue procuring its needed services under the RSA's provisions instead of from the AbilityOne vendor. Conversely, without an injunction, the Army would procure the services from the AbilityOne vendor, leaving Kansas unable to recover monetary damages if Kansas prevails in arbitration"); Ga. Vocational Rehab. Agency Bus. Enter. Program, 354 F. Supp. 3d at 701 (rejecting the government's argument that preserving the status quo harms defendant because allowing the vendor to continue operating services at the base would require the government "to remain bound to a contract beyond its expiration date" and concluding instead that "the balance of equities and public interest in granting a temporary restraining order weigh in favor of Plaintiffs").

Although it is true as discussed above that BSA is not currently operating pursuant to the RSA with a blind vendor on the Naval Base like other cases, the fact remains that BSA can continue providing services—and thus maintain its advantageous incumbent status for GVRA—while the arbitration is pending. This result still follows the polices of the RSA because it will allow GVRA to pursue its rights in arbitration on behalf of itself and BSA while maintaining the benefit of having an incumbent contractor to work with the blind vendor upon completion of the arbitration. Without an injunction, Plaintiffs will lose out on these benefits, incur

56

lost profits, and potentially lose the ability to competitively bid for the solicitation after a favorable arbitration decision.

Moreover, BSA agreed during the hearing to perform any bridge contract at the price of $130,000 per month—a price in the middle of the range for the proposed third bridge contract—which will mitigate the financial impact on Defendants having to pay a higher price than they would otherwise if they awarded the contract to another party. See TR 99:8-15; Exhibit 3. Thus, based on all of these facts, the Court finds that the harm of not awarding a preliminary injunction to Plaintiffs outweighs the harm to Defendants of maintaining the status quo pending the underlying arbitration.

### D. Public Policy

Turning to the final factor of public policy, this factor is neutral. Plaintiffs argue that public policy weighs in favor of granting a preliminary injunction because BSA will continue to provide high quality food services on the base for a reasonable price, the purpose of enlarging economic opportunities for the blind will be preserved, and the "pause" in maintaining the status quo is contemplated in the RSA in that the Defendants should have consulted with the Secretary before eliminating their bid and now approval must be sought from the arbitration panel. Defendants contend that a preliminary injunction is not in the public interest

57

because American tax payers will have to bear the burden of the Navy paying a higher cost on its contracts, the parties are circumventing the congressionally prescribed administrative process which undermines public faith in government, and granting the preliminary injunction would harm the other parties who are bidding for the contract.

Here, Defendant is correct that a preliminary injunction would harm the other parties bidding for the award and that tax payers would have to bear the cost of any increased price. However, if Plaintiffs were entitled to the contract, which the arbitration panel may conclude, then the other bidders never would have received the contract award, and Congress anticipated tax payers paying a higher price under the RSA to enlarge opportunities for the blind. Otherwise, the Navy could always give the contract to the lowest bidder. Plaintiff is correct that BSA can continue to provide dining services on the base as it has been doing and the quality of their services is not in question, and maintaining the status quo—and thus the benefits of BSA's incumbent status— while GVRA asserts its rights under the RSA in arbitration furthers the RSA's goal in enlarging opportunities for the blind. But, BSA will not be performing as a blind vendor during the pendency of the arbitration. Finally, the Court finds Defendants' argument about undermining public trust and Plaintiffs' argument regarding the pause contemplated by the RSA to be unpersuasive. As such,

AO 72A
(Rev. 8/82)

based on these facts, the Court concludes that this factor is neutral. Kansas, 171 F. Supp. 3d at 1157 ("This factor thus is neutral."); Johnson, 2014 WL 12540469, at *9 ("The final factor supports both parties equally.").

Because the Court finds that Plaintiffs have established that they are substantially likely to succeed on the merits of their claim, will suffer irreparable harm if this preliminary injunction is not granted, that the balance of the equities weighs in their favor, and that a preliminary injunction is not contrary to the public interest, it **GRANTS** Plaintiffs' application for a preliminary injunction.

Because the Court grants Plaintiffs' request for a preliminary injunction, it must determine whether or not to order that Plaintiffs post a bond to cover any wrongful damages that Defendants might suffer as a result of the injunction. Federal Rule of Civil Procedure 65(c) provides that a "court may issue a preliminary injunction . . . only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined." However, here, Defendants have not asked the Court to require Plaintiffs to post such security. Thus, "[g]iven this decision, the Court exercises its discretion under the rule and requires no security." Kansas, 171 F. Supp. 3d at 1165.

AO 72A
(Rev. 8/82)

## CONCLUSION

For the reasons stated, Plaintiffs' Application for a Preliminary Injunction, dkt. no. 9, is **GRANTED**.[11] Specifically, Plaintiff's Application for a Preliminary Injunction is **GRANTED** as follows:

1. Defendants, The United States of America, by and through the Honorable Patrick Shanahan, Secretary of Defense and the Honorable Richard V. Spencer, Secretary of the Navy, and any of its divisions, subdivisions, or agencies are hereby **ENJOINED** from proceeding with the procurement under Solicitation No. N68836-18-Q-0009 until such time as the arbitration proceeding initiated by GVRA pursuant to the RSA is concluded.

2. Defendants are **ENJOINED** from (i) making any award decision pursuant to Solicitation No. N68836-18-Q-0009, (ii) entering into a contract under Solicitation No. N68836-18-Q-0009, and commencing performance of such contract.

3. Moreover, Defendants are hereby **ORDERED** to maintain their contractual relationship with BSA as the incumbent contractor performing dining services at Naval Submarine Base, Kings Bay, Georgia, through a bridge contract until such time as

---

[11] To the extent that Dkt. No. 2 is a separate motion asking this Court for the same relief as Dkt. No. 9, it is also **GRANTED**.

AO 72A
(Rev. 8/82)

the arbitration proceeding initiated by GVRA pursuant to the RSA is concluded.

4. It is further **ORDERED** that any such bridge contract shall not be less than $128,855 per month as the Navy has already proposed that price for the proposed third bridge contract, nor exceed $130,000 per month as BSA has agreed to pay until such time as the arbitration proceeding initiated by GVRA pursuant to the RSA is concluded.

5. Finally, all Parties are hereby **ORDERED** to notify the Court, by notice on the docket, as soon as they become aware that the arbitration proceeding initiated by GVRA pursuant to the RSA is concluded. This Preliminary Injunction shall remain in effect until the Court receives such record notice.

**SO ORDERED**, this 30th day of May, 2019.

HON. LISA GODBEY WOOD, JUDGE
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA

AO 72A
(Rev. 8/82)